### MOCH v. McCOOK BROS. FUNERAL HOME, Inc.

#### No. 6033.

Court of Appeal of Louisiana. Second Circuit.

Nov. 3, 1939.

Sylvian W. Gamm, of Shreveport, for appellant.

Irion & Switzer, of Shreveport, for appellee.

DREW, Judge.

This case involves only a question of fact. The testimony is very conflicting. The lower court found the facts to be in favor of defendant. In the written opinion it said:

"Plaintiff sues the defendant for damages alleged to have been suffered by him while being transported in an ambulance of defendant company to the Charity Hospital, by being thrown against the glass door of the ambulance and receiving cuts and bruises when defendant's ambulance made a left turn into the grounds of the Charity Hospital at such a rate of speed to cause plaintiff to be thrown against said glass door.

"Plaintiff was injured in a fight with another negro out on Pierre Avenue in the City of Shreveport. In this fight plaintiff received many knife wounds on the head, upper arm, wrist, and in the side. Defendant's ambulance was called to carry plaintiff to the Charity Hospital. The ambulance proceeded along Pierre Avenue, left on Murphy Street to the entrance of the Charity Hospital, where the ambulance turned left into the yard of the hospital. Murphy street is very narrow, we judge about 24 feet wide. The yard fence around the hospital is adjacent to the sidewalk along Murphy street. At the entrance to the hospital grounds there is an inset to

the fence with the gate some 20 feet back from the sidewalk on Murphy street. There is a gatekeeper stationed there, who has a booth on the north side of the entrance extending from the sidewalk towards the gate.

"Plaintiff alleges that the injuries received by him while being transported to the Charity Hospital were caused by the negligence of defendant's driver, in the following respects:

"1. That he was driving the ambulance at a rate of speed in violation of the ordinance of the City of Shreveport, Louisiana, at the rate of ten miles an hour while making a left turn.

"2. That he was driving at a rate of speed too excessive to avoid, prevent or fail to incur injury to an already weakened passenger.

"3. That knowing your petitioner to be in an injured condition, weak, and only semi-conscious, he did fail to have someone attend him to see that he was not injured by being thrown from the ambulance bed; that he failed to secure petitioner to ambulance bed, so as to avoid throwing him therefrom.

"4. That he failed to check the speed of his ambulance before making a left turn into the hospital grounds, to such an extent that no injury would be caused your petitioner herein.

"Plaintiff testified that after having the fight and receiving the knife wounds above referred to, he went to a lady's house and asked her to telephone the police and she said she did not have a phone, and then he went over to another lady's house and she called the police 'and I waited on the steps and she give me a towel to go around my head, I waited'; and he further testified regarding his mental condition as follows:

" 'Q. And he cut you in your side and cut you on your arm? A. Yes, sir.

" 'Q. But it didn't scare you nor excite you? A. No, sir.

" 'Q. You were perfectly calm, just as calm as you are now? A. More so.'

"Plaintiff further testified that when defendant turned into the hospital, 'They turned in, turned too fast and told me to sit up, I was sitting up in the ambulance like this (indicating).' And after describing his position, he was then asked:

" 'Q. Then what? A. It threw me, I fell off, hit the glass with this hand, as they turned in, my left hand struck the glass—

" 'Q. What else? A. And then it threw me off like that (indicating).'

"Plaintiff further testified that after that the ambulance drove a little piece and stopped and that the driver said, 'I turned a little too fast for you boy; I said yes, sir.'

"The gatekeeper at the hospital said that when the ambulance turned in off the street some glass fell onto the sidewalk, the ambulance slowed up and received from him an admittance card and stopped within seven or eight feet; the two ambulance attendants testified that plaintiff was very unruly; that one of them was inside the ambulance with plaintiff; that before reaching the hospital the ambulance was stopped and the attention inside the ambulance was ordered by the driver to get out before plaintiff hurt him; that in doing so he slammed the door, breaking out the glass, and that some of it doubtless fell onto the running board and fell off when the ambulance turned into the Charity Hospital grounds. Plaintiff testified that he got out of the ambulance and walked into the hospital. Dr. Riley, at the hospital, testified that plaintiff was very uncooperative, and that plaintiff said he had been drinking; that he could smell liquor on his breath and that he acted like people do when drunk; that he, (plaintiff), would jump from one idea to another; 'he would not give me any clear idea about anything that went on'; that plaintiff was given about a half grain of morphine in the course of an hour or an hour and a half to quiet him down. Our view of the negligence charged is as follows:

"1. Defendant's driver admits that at about the time of beginning the left turn into the hospital grounds he was driving at the rate of approximately 10 or 12 miles per hour. However, no ordinance of the City of Shreveport was filed in evidence to show that this was a violation of the law.

"2. There is no evidence that a speed of ten miles per hour is excessive. The evidence shows that the ambulance slowed down, and in fact stopped as it crossed the sidewalk and before entering the gate at the hospital.

234

"3. We take it from the evidence that plaintiff was 'half drunk', had been cut by another negro, and in that condition was 'fighting mad', and although he denies that there was ever any one in the ambulance with him, or that the ambulance stopped near the railroad track, or that the door was there slammed and the glass broken, we have the testimony of the two ambulance attendants to the contrary, hence plaintiff's allegation under this head has not been proven.

"4. The evidence shows that the speed of the ambulance was checked before entering the hospital grounds. We do not think that an automobile going ten miles per hour could make a right angle turn into the hospital grounds and then stop within seven or eight feet, unless its speed was reduced 'before making a turn.'

"Our conclusion is that no negligence on the part of the drivers of the ambulance has been shown, in the absence of which there can be no recovery.

"Our conclusion from the testimony is that the glass door in the ambulance was broken at the time and place stated by the drivers thereof. There is no testimony that all of the broken glass in the door was thrown out at the time; that some of it remained in the door and fell out when the ambulance turned left into the hospital grounds. There is considerable doubt whether plaintiff received any cuts from the glass. Dr. Alverson testified that from the scar it looked like it was made by a glass cut.

"Plaintiff alleged as a part of his injuries that he received a concussion of the brain, injury to his brain and mentality, 'causing him to be permanently unable to reason clearly and recall the past in a normal manner', which we take to be the reason for the magnified allegations of injury (most of which no evidence was offered to prove), and plaintiff's testimony with regard to the actual facts that occurred on October 24, 1937.

"For the reasons assigned, the demands of plaintiff are rejected.

"Robt. J. O'Neal,
"District Judge."

We are unable to say that the finding of fact by the lower court is incorrect and are therefore without justification to say the judgment is not correct.

It is affirmed with costs.